IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN SECTION OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| TAMARA WILLIAMS, an individual, on behalf of herself and all similarly situated persons, | ) ) ) |
| | ) |
| PLAINTIFFS, | ) ) |
| | ) |
| v. | ) ) |
| THE LASIK VISION INSTITUTE, LLC, a foreign limited liability company; | ) ) ) |
| JAMES RYNERSON, M.D., an individual; | ) ) |
| JAMES M. RYNERSON, M.D. PSC, a defunct foreign corporation; | ) ) ) |
| LVI INTERMEDIATE HOLDINGS, INC., doing business as VISION GROUP HOLDINGS, LLC, a foreign corporation; | ) ) ) ) |
| LVI SUPER INTERMEDIATE HOLDINGS, INC.; a foreign corporation; | ) ) ) |
| LVI HOLDCO, LLC, a foreign limited liability company | ) ) ) |
| AG LVI HOLDINGS, LLC; a foreign limited liability company; | ) ) ) |
| AUDAX MANAGEMENT COMPANY, LLC, a foreign limited liability company; | ) ) ) |
| 9597930 CANADA, INC., a foreign corporation; | ) ) ) |
| MARK JAMIE COHEN, an individual; | ) ) |
| AVI WALLERSTEIN, an individual; | ) ) |
| MICHAEL C. FONDO, and individual | ) |

Case No. 2:20-cv-02402-JPM-tmp

(Hon. Judge Jon Phipps McCalla)

FIRST AMENDED CLASS ACTION COMPLAINT FOR:

(1) VIOLATIONS OF TENN. CODE ANN.§ 63-6-225(a) and § 63-6-226(a);

(2) AIDING AND ABETTING VIOLATIONS OF TENN. CODE ANN. § 63-6-225 (a) and § 63-6-226(a);

(3) CIVIL CONSPIRACY TO VIOLATE TENN. CODE ANN. § 63-6-225(a) AND TO ENGAGE IN THE UNLAWFUL CORPORATE PRACTICE OF MEDICINE;

(4) UNJUST ENRICHMENT;

(5) CONSTRUCTIVE FRAUD;

(6) CONSTRUCTIVE TRUST; AND

(7) CORPORATE OFFICER LIABILITY

(8) PUNITIVE DAMAGES

INDIVIDUAL CLAIM FOR:

VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN § 47-18-104(a) & (b)

JURY TRIAL DEMANDED PURSUANT TO TENN. R. CIV. PRO. 38(a) & 38(b)

|  |  |
|---|---|
| LISA ANN MELAMED, an individual; | ) |
| | ) |
| RAYMOND R. MONTELEONE; an individual; | ) |
| | ) |
| BEN L. COOK, an individual; | ) |
| | ) |
| MARK A. HOCKENSON, an individual; | ) |
| | ) |
| WILLIAM WOLZ, an individual | ) |
| | ) |
| CHRIS FOLSOM, an individual; | ) |
| | ) |
| ERIKA JACKSON, an individual; and | ) |

DEFENDANTS.

---

TO THE HONORABLE U.S. DISTRICT JUDGES:

Plaintiff Tamara Williams, on behalf of herself and all other similarly situated persons and entities, by and through her designated attorneys, and for her First Amended Class Action Complaint alleges as follows:  All allegations in this Amended Complaint are based upon the investigation of counsel, except the specific allegations pertaining to the named Plaintiff, which are based upon personal knowledge.  As of the date of this Class Complaint, no class discovery has been conducted.  As a result, it is likely that once the discovery process is underway, the named Plaintiff will seek leave to further amend this Complaint to add new factual allegations, new claims and/or new parties.

## I.

## NATURE OF THE ACTION

1.      This is a Tennessee statewide class action brought under: (i)TENN. CODE ANN. §

63-6-226(a) and (ii)Tennessee Common Law in order to remedy Defendants' unlawful scheme

and actions of engaging in, and grossly profiting from, the corporate practice of medicine in

blatant violation of Tennessee's long standing law. During the proposed Class period set forth

below, through their thinly veiled scheme, Defendants illegally garnered millions of dollars of

medical payments from Tennessee patients, all so that a Boston, Massachusetts-based hedge fund

could enrich itself and its multimillion dollar investment clients from the ownership, control and

operation of medical eye surgery centers in Tennessee. The named Plaintiff and the Class

Members seek a classwide award of compensatory damages and treble damages against

Defendants as well as Declaratory and Permanent Injunctive relief.

2.      Plaintiff additionally brings an individual claim against Defendants for violation

of the Tennessee Consumer Protection Act (hereinafter referred to as the "TCPA") of 1977, as

amended, TENN. CODE ANN. § 47-18-109(a)(1).

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

3.      Defendants James Rynerson and James M. Rynerson. MD PSC have removed this

action from Tennessee State Court to this Court , asserting that this Court has subject matter

jurisdiction over this matter and that venue is proper in this Court.

## III.

## THE PARTIES AND PERSONAL JURISCTION

4.      Plaintiff Tamara Williams (hereinafter referred to as "Plaintiff") is an individual

residing in Shelby County, Tennessee. Plaintiff is a proposed representative and member of a

Class of Tennessee medical patients who were subjected to the unlawful division of medical fees

and the unlawful corporate practice of medicine and other unlawful acts committed by

Defendants as more fully described herein.

5.      Defendant The Lasik Vision Institute, LLC (hereinafter referred to as "LVI")[1] is a

for profit limited liability company organized under the laws of the State Delaware on or about

July 15, 2011, with its principal place of business located at 1555 Palm Beach Lakes Blvd., West

Palm Beach, Florida 33401.  Service of process may be accomplished on Defendant LVI through

its registered agent for service of process, National Registered Agents, Inc. located at 300

Montvue Road, Knoxville, Tennessee 37919.

6.      Defendant James M. Rynerson is an ophthalmologist licensed to practice

medicine in Tennessee and a resident of Williamson County, Tennessee. Service of process can

be obtained on Defendant Rynerson at his home address, 1200 Talon Way, Franklin, Tennessee

37609.

7.      Defendant James M. Rynerson, M.D. PSC (hereinafter referred to as "Rynerson

PSC" and/or the "Medical Group") is a professional services corporation organized under the

laws of the State of Kentucky, with its principal place of business located in Franklin, Tennessee.

Service of process can be obtained on Defendant Rynerson PSC at 1200 Talon Ways, Franklin,

Tennessee 37609. On February 10, 2006, Defendant Rynerson PSC registered with the

Tennessee Secretary of State as a Kentucky corporation doing business in Tennessee. On August

14, 2014, the Tennessee Secretary of State revoked Defendant Rynerson PSC's registration for

failure to file an annual report. Defendant Rynerson PSC was also administratively dissolved by

---

[1] Defendant LVI is a wholly owned subsidiary of Defendant LVI Intermediate Holdings, Inc. doing business as
Vision Group Holdings, LLC. Subsequent to the filing and service of this Class Action Complaint, Defendants
Vision Holdings and LVI filed for bankruptcy protection under Chapter 11 in Wilmington, Delaware. (*See*, ECF No.
14). The claims for relief lodged against LVI and Vision Holdings have not been altered from the Original Class
Action Complaint. As such, the filing of this Amended Complaint is not a violation of the bankruptcy automatic
stay. *See*, *In re Gronczewski*, 444 B.R. 526 (E.D. Pa. Bankr. 2011) (amended complaint adding new parties and
claims did not constitute a "continuation" of the lawsuit against the Debtor and, thus, was not a violation of the
automatic stay).

4

the Kentucky Secretary of State on September 30, 2014.

8.      Defendant LVI Intermediate Holdings, Inc., doing business as Vision Group

Holdings, LLC (hereinafter referred to as "Vision Holdings")[2] is a for profit corporation

organized under the laws of the State Delaware on or about October 30, 2003, with its principal

place of business located at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401.

Service of process may be accomplished on Defendant Vision Holdings through any one of its

officers or directors located at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401

or through its registered agent for service of process, The Corporation Trust Company,

Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

9.      Defendant LVI Super Intermediate Holdings, Inc. ("LVI Super") is a for profit

corporation organized the laws of the State of Delaware on or about October 17, 2016, with its

principal place of business located at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida

33401. Service of process may be accomplished on Defendant LVI Super through its registered

agent for service of process, The Corporation Trust Center, 1209 Orange Street, Wilmington,

Delaware 19801.

10.     Defendant LVI HoldCo, LLC is a for profit corporation organized under the laws

of the State of Delaware on or about August 9,  2019, with its principal place of business located

at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401. Service of process may be

accomplished on Defendant LVI HoldCo, LLC through its registered agent for service of

process, United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

---

[2] Pursuant to this Court's Order at the July 6, 2020 Scheduling Conference, Plaintiff has submitted her First
Amended Complaint with respect to this Defendant solely to clarify that Defendant Vision Group Holdings, LLC
was a misnomer for Defendant LVI Intermediate Holdings, Inc., d/b/a Vision Group Holdings, LLC, the correct
entity name as reflected in the Notice of Appearance filed by Attorneys David Bridgers and Wells Trompeter. (*See*,
ECF No. 1-2 at p. 165). Plaintiff acknowledges that there is currently in place and automatic stay as to both LVI and
Vision Holdings as a result of their bankruptcy filings.

11.     Defendant AG LVI Holdings, LLC (hereinafter referred to as "Audax LVI") is a

for profit limited liability company organized under the laws of the State of Delaware on or

about December 19, 2013, with its principal place of business located at 101 Huntington Avenue,

23rd Floor, Boston, Massachusetts 02199.Service of process can be obtained on Defendant

Audax LVI via its registered agent for service of process, The Corporation Trust Company,

Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

12.     Defendant Audax Management Company, LLC (hereinafter referred to as "Audax

Management") is a for profit limited liability company organized and existing under the laws of

the State of Delaware, with its principal place of business located at 101 Huntington Avenue,

23rd Floor, Boston, Massachusetts 02199. Service of process can be obtained on Defendant

Audax Management via its registered agent for service of process, CT Corporation System, 155

Federal Street, Suite 700, Boston, Massachusetts 02110.

13.     Defendant 9597930 Canada, Inc. (hereinafter referred to "Canada, Inc.") is a

Canadian corporation formed by Defendants Mark Jamie Cohen and Avi Wallerstein.  Service of

process can be obtained on Defendant Canada, Inc. at its business located at 1180 Drumond

Street, Suite 400, Montreal QC H3G 2S1, Canada.

14.     Defendant Mark Jamie Cohen is an Officer and Director of Defendant Canada,

Inc. Service of process can be obtained on Defendant Mark Jamie Cohen at the business address

of 100 King Street West, First Canadian Place, Toronto ON M5X 2A1, Canada, phone number

(416) 646-0266.

15.     Defendant Avi A. Wallerstein is an Officer and Director of Defendant Canada,

Inc. Service of process can be obtained on Defendant Avie A. Wallerstein at 3638 Lorne Cres.

Apt. 3, Montreal QC H2X 2B2, Canada.

16.     Defendant Michael C. Fondo is an Officer of Defendant LVI Super. Service of
process can be obtained on Defendant Michael C. Fondo at at 101 Huntington Avenue, 23rd
Floor, Boston, Massachusetts 02199.

17.     Defendant Lisa Ann Melamed was the Chief Executive Officer and Chief Legal
and Compliance Officer of Vision Holdings and, since January 2020, serves Vision Holdings as
its Interim CEO and President. Service of process may be accomplished on Defendant Lisa
Melamed at Defendant Vision Holdings' headquarters located at 1555 Palm Beach Lakes Blvd.,
West Palm Beach, Florida 33401 or at her residence located 10940 NW 78th Place, Parkland,
Florida 33076.

18.     Defendant Raymond R. Monteleone was and is the Chief Financial Officer of
Vision Holdings. Service of process may be accomplished on Defendant Raymond R.
Monteleone at Defendant Vision Holdings' headquarters located at 1555 Palm Beach Lakes
Blvd., West Palm Beach, Florida 33401 or at his residence located at 3965 N 32nd Ter,
Hollywood, Florida 33021.

19.     Defendant Ben L. Cook is a former President, Chief Executive Officer and former
Board of Director of Defendant Vision Holdings and/or Defendant LVI. Service of process may
be accomplished on Defendant Ben L. Cook at 3232 Lago de Talavera, Wellington, Florida
33467.

20.     Defendant Mark A. Hockenson is a former President and Chief Executive Officer
of Defendant Vision Holdings and/or Defendant LVI, having served after the termination of
Defendant Ben Cook. Service of process may be accomplished on Defendant Mark A,
Hockenson his residence located at 12077 Bay Oaks Street, Parker, Colorado 80138.

21.     Defendant Bill Wolz is a former Chief Financial Officer of Defendant Vision

7

Holdings and/or Defendant LVI.  Service of process may be accomplished on Defendant Bill

Wolz at his current office address Cosmetic Solutions, LLC, 6101 Park of Commerce Blvd, Boca

Raton, Florida or his possible residence located at 13254 Hartwell Drive, Jacksonville, Florida

32225.

22.    Defendant Chris Folsom is a former Chief Financial Officer of Defendant Vision

Holdings and/or Defendant LVI, having served after the termination of Defendant William Wolz,

III. Service of process may be accomplished on Defendant Chris Folsom at 4253 Gleneagle

Drive, Boynton Beach, Florida 33436.

23.    Defendant Erika Jackson was an Officer and/or Corporate Representative of

Defendant Vision Holdings and/or Defendant LVI, having served in their legal compliance

departments and served as a Rule 30(b)(6) witness for Defendant LVI. Service of process may be

accomplished on Defendant Erika Jackson at Defendant Vision Holdings' headquarters located

at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401.

24.    Defendants Mark Jamie Cohen and Avi Wallerstein are hereinafter referred to

collectively as the "Canada, Inc. Control Person Defendants."

25.    Defendants Lisa Melamed, Raymond R. Monteleone, Ben L. Cook,  Mark A.

Hockenson, Bill Wolz, Chris Folsom, and Erika Jackson are hereinafter referred to collectively

as the "Vision Group Officer Defendants."

26.    This Court has both general and specific personal jurisdiction over each

Defendant named herein.

27.    At all relevant times described in this Complaint, Defendant LVI maintained,

staffed and operated eye surgery centers in the State of Tennessee and had substantial and

continuous contact with Tennessee patients with respect to eye surgeries and eye treatments, for

which it and/or its parent company, Defendant Vision Holdings, has billed and collected millions

of dollars in medical fees from Plaintiff and the Class Members. As a result, this Court possesses

personal jurisdiction over Defendant LVI pursuant TENN. CODE ANN.§ 20-2-201(a) & (b).

28. Pursuant to TENN. CODE ANN.§ 20-2-223(1), (2), (3), (4) & (5), this Court also

possesses personal jurisdiction over Defendant LVI on the grounds that the claims asserted

against it arise from: (i) LVI's transactions of business within Tennessee; (ii) LVI's entry into

contracts to supply services or things in this state; (iii) LVI's causing tortious injury to Plaintiff

and the Class Members by its acts and omissions in Tennessee; (iv) LVI's causing tortious injury

to Plaintiff and the Class Members within Tennessee by its acts or omissions outside Tennessee

in concert with Defendant Vision Holdings (which totally owns and controls and operates LVI)

and Defendants Audax LVI (which owns a majority interest in Vision Holdings) and Audax

Management (which directly or indirectly controls and operates Vision Holdings) and, as such,

regularly does business and/or solicits business, and/or engages in any other persistent course of

conduct, or derives substantial revenue from goods used or consumed or services rendered by

LVI; and (v) LVI's having an interest in, using or possessing real property in Tennessee.

29. Lastly, pursuant to TENN. CODE ANN.§ 20-2-214(1), (2), (3), (5), and (6), this

Court possesses personal jurisdiction over Defendant LVI on the grounds that the claims asserted

against it arise from: (i) LVI's transactions of business within Tennessee, (ii) LVI's tortious acts

and omissions committed in Tennessee; (iii) LVI's ownership or possession of any interest in

property located within Tennessee; (iv) LVI's entry into contracts for services to be rendered or

for materials to be furnished in Tennessee; and (v) any basis not inconsistent with Tennessee's

Constitution or the United States' Constitution.

30. Pursuant to TENN. CODE ANN.§ 20-2-214(1), (2), (3), (5), and (6), this Court

possesses personal jurisdiction over Defendants LVI Super, Audax LVI, Canada, Inc., and the

Canada Inc. Control Person Defendants on the grounds that the claims asserted against it arise

from: (i) their transactions of business within Tennessee through its ownership, control and

management of LVI and/or Vision Holdings, (ii) their tortious acts and omissions committed in

Tennessee; (iii) their causing tortious injury to Plaintiff and the Class Members within Tennessee

by their acts or omissions outside Tennessee in direct concert with Defendant Vision Holdings

and/or LVI; (iv) their ownership or possession of any interest in property located within

Tennessee; and/or (v) any basis not inconsistent with Tennessee's Constitution or the United

States' Constitution.

31.     At all relevant times described in this Complaint, Defendant Rynerson was and is

a resident of Tennessee. Defendant Rynerson PSC also has its principal place of business in

Tennessee. As such, Tennessee has personal jurisdiction over Defendants Rynerson and

Rynerson PC pursuant to TENN. CODE ANN.§ 20-2-222 (1).

32.     Pursuant to TENN. CODE ANN.§ 20-2-214(1), (3), (4) and (6), this Court possesses

personal jurisdiction over Defendants LVI Super, Audax LVI , Audax Management and Fondo

on the grounds that the claims asserted against them arise from: (i) their transactions of business

within Tennessee through its ownership, control and management of Vision Holdings and, in

turn, LVI, (ii) their tortious acts and omissions committed in Tennessee; and (iii) any basis not

inconsistent with Tennessee's Constitution or the United States' Constitution.

33.     Pursuant to TENN. CODE ANN.§ 20-2-223(3), this Court also possesses personal

jurisdiction over Defendants LVI Super, Audax LVI, Audax Management and Fondo on the

grounds that the claims asserted against them arise from: (i) their causing tortious injury to

Plaintiff and the Class Members by their acts and omissions in Tennessee through the direct

10

and/or indirect control of Vision Holdings and LVI and (ii) their causing tortious injury to

Plaintiff and the Class Members within Tennessee by their acts or omissions outside Tennessee

in concert with Defendant Vision Holdings and LVI.  As such, Defendants Audax LVI and

Audax Management regularly do business and/or solicit business, and/or engage in other

persistent courses of conduct, or derive substantial revenue from goods used or consumed or

services rendered by LVI and Vision Holdings in Tennessee.

34.    Pursuant to TENN. CODE ANN.§ 20-2-223(3), this Court also possesses personal

jurisdiction over each of the Canada, Inc. Control Person Defendants, Defendant Fondo and the

Vision Holdings Officer Defendants on the grounds that the claims asserted against them arise

from: (i) their causing tortious injury to Plaintiff and the Class Members by their acts and

omissions in Tennessee through the direct and/or indirect control of Vision Holdings and LVI

and (ii) their causing tortious injury to Plaintiff and the Class Members within Tennessee by their

acts or omissions outside Tennessee in direct concert with Defendant Vision Holdings and/or

LVI.

**IV.**

**<u>FACTUAL ALLEGATIONS</u>**

A.    **<u>Tennessee Law Prohibits the Corporate Practice of Medicine and the Division of
Medical Fees Without the Patient's Knowledge and Consent</u>**

35.    Since 1949, Tennessee has adopted and consistently followed the "corporate

practice of medicine doctrine prohibition." *See*, *State ex rel. Loser v. National Optical Stores

Co.*, 225 S.W.2d 263 (Tenn. 1949). The corporate practice of medicine doctrine prohibits

corporations from practicing medicine or employing a physician to provide professional medical

services. *Id.* This doctrine arises from Tennessee's TENN. CODE ANN. § 63-6-204, which broadly

defines the "practice of medicine,"[3] and TENN. CODE ANN. § 68-11-205(a)("Nothing in this part

shall authorize any person, partnership, association, corporation, or any state, county, or local

governmental unit, or any division, department, board or agency of the governmental unit, to

engage, in any manner, in the practice of the healing arts, or the practice of medicine, as defined

by law").

36.    Tennessee's corporate practice of medicine prohibition is based on a number of

public policy concerns, such as (1) allowing corporations to practice medicine or employ

physicians will result in the commercialization of the practice of medicine, (2) a corporation's

obligation to its shareholders may not align with a physician's obligation to his patients, and (3)

employment of a physician by a corporation may interfere with the physician's independent

medical judgment. *See*, TN. Atty. Gen. Opinion No. 07-116, "Provision of Medical Services By

a Certified Nurse Practitioner, Registered Nurse, Advanced Practice Nurse, Licensed Practical

Nurse or Physician Assistant" (Aug, 8, 2007 at p. 3)("[T]he court in *Loser* reasoned that if that

course were sanctioned, the logical result would be that corporations and business partnerships

'might practice law, medicine, dentistry or any other profession by the simple expedient of

employing licensed agents,' and that if this were permitted, 'professional standards would be

practically destroyed, and professions requiring special training would be commercialized, to the

public detriment.' The court in *Loser* pointed out further that the 'ethics of any profession is

based upon personal or individual responsibility,' and that one who practices a profession 'is

responsible directly to his patient or his client,' and hence 'he cannot properly act in the practice

---

[3] Tenn. Code Ann. § 63-6-204(a)(1) provides that "[a]ny person shall be regarded as practicing medicine, within the meaning of this chapter, who treats, or professes to diagnose, treat, operates on or prescribes for any physical ailment or any physical injury to or deformity of another."

of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character' ").

37.     Indeed, in *Loser*, the defendant corporation, a national maker and seller of glass lenses and frames, was deemed to have engaged in the corporate practice of medicine, notwithstanding its use of independent contractor optometrists to conduct eye exams for its customers. Although it provided space within its place of business where optometrists could do eye examinations and write prescriptions, the corporation – just as in this case - claimed that the optometrists were merely independent contractors who were paid a fee per eye examination. Just like this case, the optometrists also paid no rent for their office space though they were contractually obligated to do so. The Tennessee Supreme Court found this arrangement violated the corporate practice of medicine prohibition and was against public policy. *Loser*, 225 S.W.2d at 436 – 449.

38.     Tennessee law also clearly prohibits the division of medical fees between licensed physicians and non-physicians (or any other person) without the express knowledge and consent of the paying patient (or the person paying the medical fees on the patient's behalf).*See*, TENN. CODE ANN. § 68-11-225(a)("It is an offense for any licensed physician or surgeon to divide or to agree to divide any fee or compensation of any sort received or charged in the practice of medicine or surgery with any person without the knowledge and consent of the person paying the fee or compensation or against whom the fee may be charged").

39.     Further, no licensed physician can pay to any independent contractor a percentage of medical fees paid by or on behalf a patient where the percentage paid to the alleged independent contract is not reasonably related to the value of the goods or services provided by that contractor. *See*, TENN. CODE ANN. § 68-11-225(b).

40.    The modus operandi of the historical owners of LVI and Vision Holdings (most of whom have been private equity entities) has been to use these two companies to set aggressive financial goals so as to siphon off substantial profits for their own financial gain, all at the expense of the patients of LVI. When the well runs dry, the owners placed these companies in bankruptcy, sell its assets to a "new" entity and start the process all over again.

41.    Indeed, Vision Holdings predecessor Vision Care Group, LLC filed for bankruptcy in 2010 and sold its assets to Vision Holdings.

B.    **Audax Management, the Management Arm of Billion Dollar Private Equity Firm Audax Group L.P., Acquires a Controlling Interest in Vision Holdings So that It Can Reap Profits from the Unlawful Corporate Practice of Medicine and Unlawful Division of Medical Fees Generated by LVI And Creates A Byzantine Ownership Interest in Same.**

42.    The above restrictions were designed by Tennessee lawmakers to eliminate the practice of "money medicine" by corporations who may place their motive for profit well ahead of the need (or non-need) for patient care. Despite these clear prohibitions, the lure of easy and big money to the hedge fund industry has let to its infiltration into the Tennessee medical community in an effort to maximize profits for its large, multimillion dollar investors.

43.    In this instance, in or about 2014, Audax LVI – owned and controlled by the Audax Group, L.P, a $26 billion private equity hedge fund co-founded by Wall Street investment bankers Geoffrey Rehnert and Marc Wolpow with offices in San Francisco, New York and Boston – scouted out Vision Holdings as a venture that it could invest in, control and make millions through Audax LVI's management company, Audax Management.  At that time, as now, Vision Holdings owned all of LVI and controlled all of its actions; in fact, Vision Holdings and LVI even operated out of the same Florida office headquarters and shared employees.

44.    Defendant Audax Management and Audax LVI, along with Defendant Fondo, conducted due diligence before providing investment capital in Vision Holdings and, upon

14

information and belief, reviewed LVI's underlying contracts, revenue streams, and method of

soliciting and obtaining licensed physicians to perform eye surgeries. As a result, both

Defendants Audax Management and Fondo knew of Vision Holdings and LVI's phony scheme

to engage in the corporate practice of medicine and to divide fees in violation of various states

laws, including Tennessee, but chose to continue to consent to and ratify this scheme in order to

reap huge profits.

45.    Before providing substantial investment capital to Vision Holdings, Audax

Management created a wildly Byzantine chain of Delaware entities through which it would hold

in its equity ownership in Vision Holdings and, in turn, LVI and control the actions of these

companies. The only rational explanation for this is that Audax Management and Fondo knew or

feared that LVI and Vision Holdings were engaged in the corporate practice of medicine and the

unlawful division of medical fees and, thus, created a daisy chain ownership structure in the

hopes of avoiding liability,

46.    First, in or about December 2013, Defendants Audax Management and Fondo

incorporated Defendant AG LVI with which to hold its majority equity ownership that it (upon

information) planned to purchase from another Boston based private equity hedge fund known as

Charles Bank. In or about March 2014, Audax Management and Fondo accomplished the

transaction, purchasing approximately and eighty-four (84%) percent interest in Vision Holdings

and placed this interest in Defendant AG LVI.

47.    As a result, Defendants Audax Management, Fondo and AG LVI held control and

did in fact control the method of operation of Vision Holdings, each giving substantial assistance

or encouragement to Vision Holdings and LVI to carry out the unlawful scheme alleged herein.

48.    Indeed, upon information and belief, once becoming the controlling shareholder

15

of Vision Holdings, Defendants Audax Management, Fondo and AG LVI imposed outrageous, unattainable financial mandates on Vision Holdings and LVI without any consideration for the care for its patients. When these goals were not met, they fired various executives at Vision Holdings (including its CFO and long time CEO). Nevertheless, Defendants Audax Management, Fondo and AG LVI through their control of Vision Holdings, ordered or induced the conduct of Vision Holdings and LVI, knowing of the conditions under which their actions resulted in the corporate practice of medicine and unlawful division of medical fees or intending the consequences of same.

49.     As the activities of Vision Holdings and LVI came under tighter regulatory review, Defendants Audax Management, Fondo and AG LVI sought to create further "distance" between themselves and the companies that were violating Tennessee law.

50.     Specifically, in or about 2015, Defendants Audax Management, Fondo and AG LVI created LVI Intermediate Holdings, Inc. as a Delaware corporation that would own of all of Vision Holdings' assets and operate same. Defendants Audax Management, Fondo and AG LVI controlled the actions and operations LVI Intermediate Holdings, Inc. and consented to and/or ratified the wrongful conducted alleged herein.

51.     Then later, in October 2016, these same Defendants caused Defendant LVI Super to be incorporated in Delaware, designating LVI Super's principal place of business as the same address in Palm Beach where LVI and Vision Holdings maintained their headquarters.

52.     The convoluted ownership structure of Vision Holdings is attached hereto as **Exhibit "A"** as testified to by Defendant Lisa Melamed in Vision Holdings bankruptcy proceeding.

53.     Defendant LVI Super, through its ownership, control and operation of Vision

Holdings and LVI, owned dozens of eye clinics throughout the nation, including two in Tennessee: one in Nashville and one in Germantown. These eye clinics almost exclusively performed and charged for refractive surgery consisting of LASIK (meaning "laser-assisted in situ keratomileusis") surgery and PRK (meaning, "photorefractive keratectomy") in order to correct for near and far sightedness and astigmatisms. These surgical procedures must be performed by a Tennessee licensed ophthalmologist.

54.     For states like Tennessee prohibiting the corporate practice of medicine and/or the division of medical fees with non-physicians without the knowledge and consent of the paying patient (or insurance company or other third party, when applicable), LVI and Vision Holding concocted a scheme that attempted, albeit thinly, to disguise the fact that they were practicing corporate medicine and dividing medical fees.

55.     Specifically, LVI Super and Vision Holdings and LVI, would recruit ophthalmologists for their eye surgical centers so that medical fees for eye surgeries could be generated and then divided between LVI and these physicians. LVI Super and Vision Holdings, acting on behalf of LVI, would request that the physicians they recruited become licensed in a particular state (if they were not already licensed at the time of the solicitation) so that the physicians serve as a figurehead for an eye surgery practice at LVI's eye clinics which LVI, through Vision Holdings, would allegedly "assist" in managing. In reality, other than the eye surgeries themselves, Vision Holdings, acting for and controlling LVI, managed, controlled, and operated every aspect of the eye surgery centers with no input from the physicians.

56.     Generally, these physicians would drive or fly into an LVI eye center, crank out eye surgeries on patients as if they were cars on a conveyor belt, then drive or fly out of town the same day, performing virtually no follow-up patient care, which was almost always left to an

optometrist that LVI and Vision Group had hired (but had not trained).

57.    In fact, LVI Super and Vision Holdings, acting on behalf of LVI, were so hungry

for profits that it contractually required LVI's operating physicians to perform a medical

procedure on at least four (4) patients per hour each time these physicians appeared for surgical

work at each eye center, thus casting aside the independent judgment necessary for patient care

in favor of running up the revenues.

58.    Further, LVI Super and Vision Holdings, acting on behalf of LVI, created written

policies directing its physicians and clinical technicians as to how these surgeries should be

conducted, apparently in an effort to prevent or mitigate their own liability for medical

malpractice, which clearly constitutes the practice of medicine.

59.    Indeed, in this vein, LVI Super and Vision Holdings, acting on behalf of LVI,

contractually required each of LVI's physicians to purchase a medical malpractice professional

liability policy with minimums of $1,000,000 per occurrence/$3,000,000 and further required

these physicians to attempt to add LVI as an additional insured on these policies.

60.    Among other things, LVI, under the control and direction of LVI Super, Fondo

and Vision Holdings: (i) leased each surgical center in its name and made all rent payments, (ii)

interviewed and selected the ophthalmologist who would work at LVI's eye clinics, (iii)

interviewed and selected the optometrists to be utilized at the eye clinics, (iv) interviewed and

hired all laser techs and other clinic workers at each eye center; (v) interviewed and hired all

non-clinical worker and staff at each eye center, (vi) billed and collected from all patients and or

their insurance companies for all medical procedures, (vii) provided financing for patients for

medical procedures, (viii) owned and maintained the lasers, the microkeratomes and all other

equipment at LVI's eye clinics, (ix) conducted all advertising for LVI and its eye clinics, (x) paid

all technicians and other clinical staff employees, (xi) paid all non-clinic staff employees and (xii) paid each ophthalmologist and OD a de minimus amount per eye procedure, while retaining the balance (which frequently comprised as much as 90% or more of the total gross medical fees paid by Tennessee patients) to supposedly satisfy "Overhead Fees," "Facility Fees," and "Equipment Fees," which in reality were completely fabricated, never incurred and never even charged to the physicians.

61.    LVI's charges for refractive surgery ranged from $1200 to $1700 per eye, depending upon the procedure. However, out of those surgical fees, Vision Holdings and LVI only paid its operating physicians between $85 to $150 per eye, with LVI to keeping all of the remaining medical payments made by or on behalf of patients for it and Vision Holdings.

62.    LVI would further increase its ill-gotten profits by offering so-called "enhancements" or "warranty" plans to patients.  In legal clinics, physicians do not ordinarily charge LASIK patients for follow up procedures are necessary to ensure a positive outcome.  In contrast, LVI sells "enhancements" or "warranty" plans referred to as "Lifetime Assurance" plans, which entitle patients to follow-up procedures but at extra costs to patients.  Although many patients never return for additional procedures, LVI pockets this money.  Moreover, if a patient does require another procedure, LVI pays nothing to the physician to perform the follow-up procedure.

63.    Each of the Vision Holding Officers knew that the amount of any and all revenue that LVI and Vision Holdings were able to garner from this scheme was totally dependent upon the number of eye surgeries performed by licensed physicians in Tennessee and paid for by these physicians' patients (or a third party). Further, as opposed to charging a reasonable fee for their alleged management assistance that was not contingent on medical payments, LVI and Vision

19

Holdings were simply dividing medical fees, contrary to Tennessee law, of which the Officer

Defendants were fully aware. Indeed, Defendant Erica Jackson, Vision Holdings and LVI have

all admitted under oath that LVI never truly charged any "Overhead Fees," "Facility Fees," nor

"Equipment Fees" that are outlined in its "Management Services Agreement" with Tennessee

physicians. They have further admitted under oath that these so-called fees did not represent fair

market value for the services that LVI ostensibly provided to Tennessee physicians.

C.    **Audax Management Causes Audax LVI to Sell its Controlling Stake in LVI Super
      to Defendant Canada, Inc., Which through the Substantial Assistance, Ratification
      and Consent of the Canada, Inc. Control Defendants, Continued the Illegal
      Practices of Vision Holdings and LVI.**

64.    In or about March 2019, Defendants Audax LVI, Audax Management and Fondo

determined that the aggressive financial goals they imposed on Vision Holdings were not

working out. As a result, these Defendants participated in a sale of Audax LVI's controlling

interest in LVI Super, selling an eighty-four percent (84%) stake in LVI Super to Canada, Inc., a

corporation created, owned and controlled by the Canada, Inc. Controlling Defendants,

ophthalmologists Mark Cohen and Avi Wallerstein.

65.    The Canada, Inc. Control Person Defendants conducted their own due diligence

before causing Canada, Inc. to purchase Audax LVI's interests. They learned the business

operations of LVI Super, Vision Holdings and LVI and knew that in certain states these entities

were sharing medical fees with physicians and that the corporate practice of medicine was a

regulatory concern. The Canada, Inc. Control Person Defendants in fact recruited a number of

physicians to come work at various medical clinics owned and operated by LVI Super, Vision

Holdings and LVI and thus knew of the Management Service Agreements being utilized in

Tennessee and other states. They further knew or the policies practices of LVI Super, Vision

Holdings and LVI which included – as testified under oath by Defendant Rynerson – direct

medical mandates provided to LVI's operating doctors.

66.    With this knowledge, the Canada, Inc. Control Person Defendants directed, ordered, ratified, approved, or consented to the wrongful acts of LVI Super, Vision Holdings and LVI through Canada, Inc.

67.    Although the Canada, Inc. Control Person Defendants may claim they were acting on behalf of Canada, Inc. and/or LVI Super, they are nevertheless charged in law with affirmative official responsibility in the management and control of the corporate business, and thus cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval.

68.    After purchasing its controlling interest in LVI Super, Canada, Inc. strangely caused the creation of Defendant LVI HoldCo, LLC in August 2019 which allegedly now owns all of LVI Super, with Canada, Inc. owning eighty-four (84%) of LVI HoldCo, LLC. This appears to be yet another effort by the true owners and controllers of LVI Super and Vision Holdings to avoid liability.

D.    **Each of the Vision Group Officer Defendants Directed, Ordered, Ratified, Approved, or Consented to the Wrongful acts of Vision Holdings and LVI.**

69.    Each of the Vision Group Officer Defendants knew of and participated in the unlawful scheme conducted by Vision Holdings and LVI to share medical fees without proper disclosure and to engage in the corporate practice of medicine in order to garner huge profits by directing, ordering, ratifying, approving and/or consenting to the unlawful business practice.

70.    Each of the Vision Group Officer Defendants were aware, or were reckless or negligent, in disregarding that Tennessee law prohibits the corporate ownership of medical

clinics such as LVI's eye surgery centers. In fact, upon information and belief, each of the Vision

Group Officer Defendants learned at some point that in 2013 LVI was forced to shut down its

Nashville, Tennessee eye surgery clinic because a corporate entity, as opposed to a licensed

physician, could not owned the practice.

71.     Further, each of the Vision Group Officer Defendants were aware, or were

reckless or negligent, in disregarding that Vision Holding and LVI were sharing fees with

Tennessee medical doctors without disclosure to Tennessee patients.

72.     Each of the Vision Group Officer Defendants directed, ordered, ratified, approved

and/or consented to Vision Holdings and LVI's practice of sharing fees with medical doctors.

73.     The Vision Group Officer Defendants sought to skirt Tennessee's corporate

practice of medicine prohibition by seeking out licensed Tennessee physicians who would serve

as "figureheads" of the medical practice, when in truth the practice would be corporately owned

and operated solely for profit.

74.     The Vision Group Officer Defendants knew that LVI and Vision Holdings would

be the de facto true owner of medical eye practices in Tennessee and would run them entirely,

save and except for the actual surgeries performed by Tennessee physicians. They further knew

that LVI and Vision Holdings, through their own actions, would direct Tennessee physicians on

how to practice medicine, so that each medical clinic could operate at a maximum profit.

75.     Specifically, Vision Group Officers devised and/or carried out a marketing plan to

recruit doctors and sign them up to LVI's Management Services Agreement ("MSA"). The MSA

directly called for the sharing of medical fees generated by eye surgeries and required that eye

physicians conduct at least four (4) eye surgeries per hour "[i]n order to maximize gross

amounts."

22

76.     The Vision Group Officer Defendants knew that medical fees were being shared and that LVI's Tennessee physicians were not actually paying any "Overhead Fees," "Facility Fees," and "Equipment Fees" to LVI for its management services and that these so called fees where phony and designed to give the false impression that LVI and Vision Holdings were not violating Tennessee's prohibition of the corporate practice of medicine, when they fully knew was occurring.

77.     The Vision Group Officer Defendants devised and/or utilized a "Patient Consent Form" which they required by used at each medical eye clinic. That form itself involves the practice of medicine because it purports to provide material medical information to the patient so that the patient can (supposedly) make an informed decision as to whether eye surgery should be performed. It also falsely represents to the patient that "LVI does not engage in the practice of medicine," which the Vision Group Officer Defendants knew or should have known was false.

**E.     LVI Super, through Vision Holdings,  Recruits Rynerson and Rynerson PSC and Proposes that They Enter into a Sham "Management Agreement" with LVI to Disguise LVI and Vision Holdings' Corporate Practice of Medicine and the Unlawful Division of Medical Fees.**

78.     In 2013, Rynerson was a licensed ophthalmologist living and working in Kentucky. At that time, as testified under oath by Rynerson, Kim Weiss, an employee of Vision Holdings acting on behalf of LVI, contacted Rynerson by phone and told him that LVI had an eye clinic in Nashville that had to be shut down because someone complained that Tennessee state law prohibited the corporate practice of medicine and that a doctor had to own the clinic. LVI wanted to reopen the Nashville clinic and wanted to use Rynerson's name on the ownership papers. (*See*, Deposition of James Rynerson at 14:11 – 15:15, attached hereto as **Exhibit "B"**).

79.     LVI explained to Rynerson that that Tennessee law required a doctor to be the figurehead as the owner of the medical practice so that LVI could operate a clinic in Tennessee;

thereby inducing Rynerson to sign the MSA (detailed in paragraph 43) and join LVI in the

scheme described herein. (50:4 -19).  In fact, due to certain economic hardships, Rynerson was

effectively forced by LVI to enter into the MSA.  Rynerson secured his Tennessee physician's

license strictly for LVI and its Tennessee clinics. (51:16 – 52:1).

80.    Kim Weiss specifically told Rynerson that LVI had a LASIK center in Nashville,

which had to be closed because LVI was not allowed to own a medical practice due to

Tennessee's prohibition on corporate ownership of a medical practice. To avoid that, Ms. Weiss

stated that LVI needed a licensed physician to act as a medical "figurehead" and indicated to

Rynerson that LVI would employ him so long as he signs an agreement stating otherwise. (85:13

– 86:10).

81.    On or about April 16, 2013, Rynerson signed a document entitled "Management

Services Agreement" (hereinafter referred to as the "MSA"), which was drafted and provided to

him by Vision Holdings. (A true and correct copy of the MSA is attached hereto as **Exhibit**

**"C"**). This was done so the LVI's Nashville eye clinic could be reopened.

82.    The MSA technically made Rynerson PSC the owner of the eye clinic but, in

reality, LVI owned the clinic and all of the equipment utilized at the clinic.  LVI, not Rynerson

PSC, took all the money out of the Tennessee clinic, interviewed and hired everyone, paid

everyone and paid a fee per surgery to the surgeons. (15:18 – 16:7).

83.    Rynerson also signed an MSA for LVI eye clinics in Memphis and in

Birmingham. LVI asked him to sign a second MSA for Birmingham because the first MSA did

not technically make Rynerson the owner of the clinic but, instead, was just an employment

agreement. (17:18 – 18:2).

84.    Rynerson's duties were exactly the same in each of these eye clinic locations.

24

(18:3 – 13).  Rynerson did not, in fact, manage (or own) any of these offices, notwithstanding the

sham agreements to the contrary.  Rather, all of the management was handled by LVI behind the

scenes.  Rynerson simply showed up when directed by LVI and performed eye surgeries. (18:14

– 19).  Nothing more.

85.    Indeed, Rynerson had no role whatsoever in managing any of these clinics.  For

instance, LVI is an advertiser for eye surgery on the internet on a nationwide basis, but Rynerson

and Rynerson PSC never paid for any of LVI's advertising. (19:2-9).

86.    Likewise, LVI brought in all the patients, interviewed them and scheduled them

for surgery. (19:10 – 14). Rynerson had no hand in doing any pre-operative interviews or office

visits and did not otherwise meet with LVI patients until the day of the surgery.

87.    For example, all of the laser technicians, whose role was to calibrate the laser

used by the physician to re-shape a patient's cornea, were employees of LVI and were not under

the control or supervision of Rynerson or other physicians.

88.    Although the MSA states that Rynerson PSC shall receive all of the gross

amounts of medical payments made by patients, Rynerson PSC never, in fact, received such

payments and never billed patients for medical services. (19:18 – 20:1). Instead, LVI billed

patients for all medical services, collected all medical payments and then paid Rynerson a fee for

each eye surgery. (20:3 – 10).

89.    Likewise, LVI set Rynerson's surgery schedule in each of the two LVI eye

clinics, (20:11- 20), and would thereafter direct him to work on particular days. Unless he asked,

Rynerson was not told by LVI how many patients he would be seeing for surgery. (20:21 –

21:10).

90.    Rynerson typically performed 10 to 20 eye surgeries in Memphis per visit. He

never met the patients until the day of surgery. Instead, the optometrist working for LVI would conduct the pre-operative consultations and office visits. Regardless of what work performed by him, Rynerson was only paid on a per eye basis. (25:7 – 9).

91.     After performing such surgeries for one day in Memphis, Rynerson would typically drive to Nashville or Birmingham and perform additional surgeries under the same circumstances and at LVI's direction. (25:10 – 16).

92.     Patients' charts were prepared by LVI before Rynerson saw the patients. They were assembled and completed before each surgery, including forms for post op care, which would already have been given to the patients. (27:21- 28:6).

93.     Rynerson never saw a given patient again for post op follow up unless the patient had a complication or needed an enhancement (a second surgery). (28:7 – 12).

94.     Only Rynerson and another doctor, Dr. Miller, performed surgeries in the Memphis location. Rynerson did not hire Dr. Miller and had no professional relationship with Dr. Miller. Rynerson is not aware any particular arrangement Dr. Miller had with LVI. (29:10 – 24).

95.     Despite the MSA stating that Rynerson's medical practice would collect all medical payments, Rynerson and Rynerson PSC never in fact collected these fees. LVI never disclosed to Rynerson the amount of the medical fees it collected from patients.

96.     LVI had established a bank account in the name of Rynerson or Rynerson PSC, but Rynerson never knew the account numbers and never had access to this account.  Rynerson never utilized this account. Instead, LVI deposited patient payments into the account and then conducted a daily sweep into another account owned by LVI or Vision Holdings. (37:4 – 17). Rynerson knew that LVI would manage these accounts just to pay him a per fee price, which he

viewed as "how the game was to be played." (70:2 – 6).

97.    The MSA called for Rynerson to pay LVI a $75,000 per month "Facility Fee." Rynerson never paid that to LVI. He also never paid the $50,000 per month "Equipment Fee" nor the $75,000 per month "Overhead Fee." (34:23 – 35:13).

98.    Rynerson received less than 10% of the medical fees paid by the patients he saw at LVI. (35:19 – 36:1).

99.    Rynerson never paid any rent to LVI's landlord nor to LVI. (36:2 – 22).

100.    The MSA required that Rynerson was to maintain professional medical malpractice insurance and, if possible, to add LVI as an additional insured under that policy. (37:18 – 24).

101.    LVI owned the equipment utilized at the LVI eye clinics.

102.    Rynerson never paid utilities on any LVI eye clinic location. (39:2-4).

103.    LVI's employees did all the accounting but never gave Rynerson any periodic financial statements. Instead, in order to determine what LVI should pay him, Rynerson had to add up the number of patients he performed surgeries on over the course of any particular day. (39:5 – 13).

104.    Rynerson did not maintain any medical records; LVI maintained these. If Rynerson wanted to review any medical records, he would have to contact LVI and request them. (40:4 – 15).

105.    The MSA called for LVI to submit a monthly Reimbursable Amounts Invoice to Rynerson PSC detailing the cost of support staff incurred by LVI on its behalf. Rynerson never received any such invoice from LVI. (40:16 – 41:8).

106.    Rynerson was never given anything by LVI showing the total amount of

27

revenues. (41:9 – 12).

107.    Rynerson never had an office at any of the LVI eye clinics to use as a medical

office. (42:10 – 16).

108.    Rynerson never paid any money to LVI. (42:18 – 43:1).

109.    When Rynerson was in private practice (not with LVI), Rynerson made $1500 to

$1600 per eye for LASIK surgery. With LVI he made $125 to $150, per eye procedure; as a

result, Rynerson made about 10 times more in private practice as compared to with LVI. (43:12 –

24).

110.    Rynerson had no input or participation into the business operation of LVI. He had

no input or participation in the solicitation of patients for LVI. (44:12 – 21).

111.    LVI knew full well that Rynerson was not the real owner of the medical practice.

(44:22 – 45:4).

112.    Section 7e of the MSA - which deals with Payment of Fee – was never

implemented or complied with by the parties. (49:15 – 23). Thus, Rynerson never paid other

doctors and ODs, despite the statement that the "payment by Medical Group of the salaries and

other contractual benefits for its Physicians and Optometrists," including salaries, benefits, and

professional compensation, would be made.

113.    Rynerson worked for four and a half years in the Memphis LVI clinic. (60:4 – 8).

114.    When he signed the MSAs for Nashville and Memphis, Rynerson knew that he

was being brought in as a figurehead. He knew he was signing an MSA so that LVI could skirt

Tennessee law. (61:17 – 62:5).

115.    Rynerson's understanding of his relationship with LVI was that he would come in

and do the surgeries and leave; LVI would take care of everything because it was their medical

practice and their income. (64:1 – 10). LVI was doing everything in the practice except doing surgeries. (65:18 – 21).

116.    From time to time, LVI told Rynerson how to practice medicine. (65:22 – 66:1). Rynerson believes that Ericka Jackson, legal counsel for LVI, sent medical directives to Rynerson. (83:12 – 16).

117.    In fact, as testified by Erika Jackson – the in-house legal director of Vision Holdings – as a corporate representative of LVI, LVI created written policies and instructions as to the steps that LVI's eye surgeons and laser techs were required to perform in connection with each surgery.  (Erika Jackson - LVI Rule 30.02(6) Corporate Depo. at 65:23 – 67:19, attached hereto as **Exhibit "D"**).

118.    LVI sent to Rynerson and others memos and emails on how to handle complications and dictating how the doctors were supposed to practice medicine at LVI. (66:2 – 10). Sometimes Rynerson followed LVI's directives. (67:3 – 4). The Defendants in this matter have no factual basis to deny this testimony from Rynerson.

119.    LVI told Rynerson that, if he refused to follow the medical directives that LVI sent him, he would get a phone call from someone concerning his failure to comply and, on at least one occasion, received such a phone call. These memos contained medical requirements as opposed to merely suggestions. (67:19 – 68:11).

120.    The MSA states that LVI would "assist" the medical group. In reality, LVI did everything, rather than merely assist. Rynerson had nothing to do with the medical practice other than conduct surgeries. (79:24 – 80:8).

121.    Rynerson had nothing to do with patient Consent Form signed by patients. (Ex. 4); LVI prepared the Consent Forms. (84:22 – 85:9).

122.    Rynerson knew that, unlike his practice in Kentucky where he owned the practice

and put fees in his bank account and paid expenses, that LVI was having him sign as a

technicality just so that LVI reopen their center in Nashville. (86:11 – 87:7).

123.    Rynerson never recruited any person for any job function at LVI. In fact, when

one medical technician took a leave of absence, LVI refused to hire her back despite Rynerson

lobbying for her to be rehired. Rynerson wanted her rehired because she was proficient at her job

and better than the person LVI hired. (52:22 – 53:14).  Though Rynerson did sign agreements

with optometrists early in his relationship with LVI, he later refused to continue to do so due to

his concerns about inadequate patient care. LVI was hiring these ODs without any input from

Rynerson. Accordingly, Rynerson refused to sign agreements with other ODs about half way

through his tenure with LVI. (73:10 – 74:13).

124.    LVI paid the ODs and everybody else. (87:7 – 10). For example, LVI hired Dr.

Kamin (an OD).Rynerson never interviewed her or hired her. Rynerson did not determine what

she was paid. LVI paid Dr. Kamin. (87:13 – 88:2).

125.    Often, LVI would hire a new OD and then would send Rynerson a contract for

him to sign that would say he is hiring the OD. But Rynerson never met the OD, never

interviewed the OD, and had no knowledge of the OD's experience. He would simply show up at

a new surgery and there would be a new OD. (87:23 – 88:14).

126.    Rynerson ultimately stopped signing additional independent contractor

agreements with ODs solicited by LVI because he believed that there was inadequate patient care

by these ODs. (88:15 – 19)

127.    Rynerson observed a lack of care by an OD (Dr. Kamin) when she said a patient

had diffuse lamellar keratitis (an inflammation) –which was incorrect -  and prescribed steroids,

which caused the patient's eye pressure to increase dramatically. The patient suffered a negative

outcome, so Rynerson determined that he could not risk his license and reputation on ODs that

LVI was just hiring to plug into the clinic. (86:15 – 90:16).

128.    Rynerson told Ron Antonovich of the problem with Dr. Kamin in 2015. He

informed LVI that he was no longer comfortable signing off on more OD agreements, as he had

for others, including Dr. Kamin. (91:13- 93:4).

129.    For four (4) years Rynerson operated under the MSA but the description

contained in the MSA is not the way LVI's eye clinics functioned in reality. (93:5 – 18).

**F.    Vision Holdings Is the Alter Ego of LVI Super; Thus LVI Super is Liable for All
        Acts and Omissions of Vision Holdings and LVI.**

130.    Pursuant to Tennessee law, Vision Holdings is the alter ego of LVI Super.  Vision

Holdings is totally owned and controlled by LVI Super, which has as used Vision Holdings as a

means to commit a fraud and to violate Tennessee statutes and Tennessee's public policy with

respect to Tennessee eye patients.

131.    Factors to be considered in determining whether to disregard the corporate veil

include not only whether the entity has been used to work a fraud or injustice in contravention of

public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the

corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole

ownership of stock by one individual entities; (5) the use of the same office or business location;

(6) the employment of the same employees or attorneys; (7) the use of the corporation as an

instrumentality or business conduit for an individual or another corporation; (8) the diversion of

corporate assets by or to a stockholder or other entity to the detriment of creditors, or the

manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in

illegal transactions; (10) the formation and use of the corporation to transfer to it the existing

31

liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

132.    Upon information and belief, Vision Holdings' relationship fulfills all or almost all of these factors.

133.    First, LVI Super owns all of the stock or membership interest in Vision Holdings.

134.    Second, LVI Super and Vision Holdings use the same business address and location in West Palm Beach, Florida.

135.    Third, upon information and belief, Vision Group is grossly undercapitalized. (Indeed, it recently filed for bankruptcy).

136.    Fourth, Vision Holdings shares employees with LVI Super.

137.    Fifth, LVI Super clearly uses Vision Holdings as business conduit for itself.

138.    Sixth, LVI Super has used Vision Holdings as a subterfuge to conduct the corporate practice of medicine and violate the well established public policy of Tennessee. Lastly, upon information and belief, LVI Super and Vision Holdings do not maintain an arm's length relationship. Upon information and belief, LVI Super Vision Holdings drained substantially all revenue and profit from Vision Holdings during its ownership.

**G.    Plaintiff Williams and Her Medical Treatment by LVI and Rynerson.**

139.    In July 2018, Plaintiff Williams saw an LVI advertisement for eye correction surgery and made an appointment at LVI's Germantown eye clinic. She was seen by an OD who scheduled her for PRK surgeries for both eyes. LVI requested that Plaintiff make a $100 deposit to be paid to LVI for her surgeries, which she did.

140.    Later, in July 2018, Rynerson performed PRK surgery on Plaintiff's left eye. On July 18, 2018, Rynerson performed PRK surgery on her right eye.

141.    On July 18, 2018, LVI invoiced Plaintiff for $3,718 (less her $100) for a net total

of $3,618. The invoice reflected $1,359 for "Custom Wave Front PRK Multi" for each eye and $200 for "Plugs Long Duration Pair Insertion." LVI also sold Plaintiff what it dubs "The LASIK Vision Institute Lifetime Assurance Plan" for $200 per eye.

142.    LVI further offered Plaintiff the ability to finance the $3,618 that LVI had invoiced her. Plaintiff then entered into a credit agreement to pay this amount over 24 months interest free, with 26.99% interest to accrue and be owed on the full amount if not paid in 24 months. Plaintiff has timely made all payments due under this arrangement.

143.    At no time did any Defendant or any other person or entity disclose to Plaintiff that LVI and/or Visions Holdings were dividing medical fees with Rynerson, Rynerson PSC or any other person.

144.    At no time did any Defendant or any other person or entity disclose to Plaintiff that LVI and/or Visions Holdings were engaged in the corporate practice of medicine. Had Plaintiff known the truth – that Vision Holdings, LVI Super and LVI were engaged in a prohibited practice involving medicine she would not have engaged their services. This critical information was uniformly withheld from Plaintiff and the Class Members.

**V.**

**CLASS ACTION ALLEGATIONS**

145.    The named Plaintiff brings this action as a Class Action pursuant to Rule 23.01 and pursuant Rule 23.02(3)of the Tennessee Rules of Civil Procedure as defined follows:

> For the applicable statutes of limitations time period for each count in this Class Complaint, Plaintiff and all similarly situated persons who had any eye procedure performed at any LVI eye clinic operating in Tennessee and who has paid any compensation to any Defendant in this matter in connection with same.

> Excluded from the Class are the Judge assigned to this matter and any member of the Judge's staff and immediate family.

146.    **Numerosity.**    The requirements of Rule 23.01(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable.  Upon information and belief, these Class Members exceed 1,000 in number.  This Class, as defined above, meets the numerosity requirement.

147.    **Commonality.**    The claims of the Class Members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23.01(2).  These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, include, but are not limited to, the following questions:

**Common Questions of Fact**

(i)      How many patients had medical procedures performed at LVI's Tennessee eye clinics during the Class period?

(ii)     What were the total annual gross revenues received by LVI and/or Vision Holdings from the medical procedures performed at LVI's Tennessee eye clinics the during the Class period?

(iii)    What were the total amounts paid by LVI and/or Vision Holdings to the physicians that performed medical procedures at LVI's Tennessee eye clinics during the Class period?

(iv)     Is LVI Super the alter ego of Vision Holdings?

(v)      Whether any Defendant engaged in the corporate practice of medicine?

(vi)     Did any Defendant order or direct Vision Holdings and/or LVI's wrongful conduct, knowing of the conditions under which the act is done or intending the consequences which ensue?

34

(vii)    Did any Defendant know that Vision Holdings and/or LVI's wrongful conduct constituted a breach of duty and did they provide substantial assistance or encouragement to Vision Holdings and/or LVI's so to conduct themselves in such a manner?

(viii)    Did any Defendant give substantial assistance to Vision Holdings and/or LVI in accomplishing a tortious result and their own conduct which constitutes a breach of duty to Tennessee patients?

(ix)    Did any of the Defendants conspire with one or more other Defendants for the purpose of violating TENN. CODE ANN.§ 63-6-225(a)?

(x)    Did any of the Defendants conspire with one or more other Defendants for the purpose of violating TENN. CODE ANN.§ 63-6-225(b)?

(xi)    Did any of the Defendants conspire with one or more other Defendants for the purpose of conducting the corporate practice of medicine?

(xii)    Did any of the Defendants act with intent or reckless disregard with respect to their unlawful conduct?

(xiii)    Did any of the Defendants direct, order, ratify, approve, or consent to the wrongful acts of LVI Super, Vision Holdings and LVI?

**Common Questions of Law**

(i)    Whether any of the Defendants violated TENN. CODE ANN.§ 63-6-225(a) by dividing physician medical fees.

(ii)    Whether any the Defendants violated TENN. CODE ANN.§ 63-6-225(b).

(iii)    Whether any of the Defendants aided and abetted any other Defendant in connection with a violation of TENN. CODE ANN.§ 63-6-225(a).

35

(iv)    Whether any of the Defendants aided and abetted any other Defendant in

connection with a violation of TENN. CODE ANN.§ 63-6-225(b).

(v)    Whether any of the Defendants have been unjustly enriched by the corporate

practice of medicine.

(vi)    Whether a constructive trust should be imposed upon the assets of the Defendants.

148.    **Typicality**.  The claim of the named Plaintiff is typical of the unnamed Class

Members because they have a common source and rest upon the same legal and remedial

theories, thereby satisfying the requirements of Rule 23.01(3). For example, the named

Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class Members

were injured or damaged by the same wrongful practices in which Defendant engaged, namely

the unlawful corporate practice of medicine and the unlawful division of medical fees.

149.    **Adequacy of Representation.**  The requirements of Rule 23.01(4) are satisfied in

that the named Plaintiff has a sufficient stake in the litigation to vigorously prosecute her claims

on behalf of the Class Members and the named Plaintiff's interests are aligned with those of the

proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiff

individually, as distinguished from the other members of the Class, and the relief sought is

common to the Class.  Plaintiff does not have any interest that is in conflict with or is

antagonistic to the interests of the members of the Class, and has no conflict with any other

member of the Class.  Plaintiff has retained competent counsel experienced in class action

litigation, including consumer and financial services class actions, to represent her and the Class

Members in this litigation.

150.    To wit, Plaintiff's chosen counsel – Watson Burns, PLLC – has successfully

prosecuted class actions in several matters.  *See, e.g., Babb, et. al.  v. Wilsonart International,*

*Inc.* Civil Action No.  01818-04, Div. 4 (Cir. Ct. Shelby County, Tennessee filed Mar. 30,

2004)(appointed Co-Lead Class Counsel to consumer class action involving defective kitchen

countertops owned by over 10,000 consumers; case was certified as a nationwide class action

and ultimately settled for a compensatory damages of $23.5 million to the class); *Howard et al*

*v. Wilkes & McHugh, P.A.*, Case No. 2:06-cv-02833-JMP-cgc (W.D. Tenn. 2006)(appointing

Watson Burns, PLLC as Class Counsel and ultimately approving $4million settlement in

connection with overcharged legal fee); *Stephenson et al v. Fearnley & Califf, PPLC*, Civ.

Action No. 06-67 (Dyersburg Circuit Ct. 2006)(Watson Burns, PLLC appointed Class Counsel

in connection with settlement regarding unlawful title insurance fees charged by law firm);

*Squires v. The ServiceMaster Co. and Clayton Dubilier & Rice, Inc*., CH-08-0471-Part II

(Chancery Ct. Shelby Co., Tennessee filed Mar. 11, 2008)( appointed Co-Lead Class Counsel to

employees who held options on ServiceMaster stock that had been wrongfully canceled; case

settled on a class basis for $1 million); *Ham et al. v. Swift Transportation Co., Inc*. Case No.

2:09-cv-02145-JTF (W.D. Tenn. filed Mar. 11, 2009)(appointed Co-Lead Class Counsel to class

of approximately 8,700 student truck drivers who lost their commercial drivers licenses based on

the alleged wrongful actions of Swift's trucking driving school; case settled for compensatory

damages and debt write off valued in excess of $17 million); *Youngblood v. Linebarger,*

*Goggan, Blair & Sampson, LLP*, Case No. 10-cv-2304 SHM-tmp (W.D. Tenn. filed

2010)(appointed Co-Lead Class Counsel in class action against law firm for its collection of an

unlawful attorney fee from delinquent real property taxpayers) and *Youngblood v. Linebarger,*

*Goggan, Blair & Sampson, LLP*, CH-13-0899-Part III (Chancery Ct. Shelby County, Tennessee

filed June 18, 2013)(subsequent case settlement in state court for $7.4 million).

151.   **Predominance and Superiority.** All of the requirements for Rule 23.02(3) are

satisfied because the common factual and legal issues identified above are sufficiently cohesive
to warrant adjudication by representation.  In particular, the Plaintiff and the Class Members
have suffered a common cause of injury, requiring Plaintiff and Class Members to pay medical
fees that are generated by the unlawful corporate practice of medicine and the unlawful division
of medical fees. The Class Members' legal claims arise exclusively under Tennessee law and,
therefore, do not involve the application of other states' laws which may have varying degrees of
liability and proof. Class action treatment is also superior to other available methods for the fair
and efficient adjudication of this controversy, because individual litigation of the claims of all
Class Members is economically unfeasible and procedurally impracticable.  The likelihood of
individual Class Members prosecuting separate claims is remote and, even if every Class
Member could afford individual litigation, the court system would be unduly burdened by
individual litigation in such cases.  Additionally, individual litigation would also present the
potential for varying, inconsistent or contradictory judgments while magnifying the delay and
expense to all parties and to the court system, thus resulting in multiple trials of the same legal
issue and creating the possibility of repetitious litigation.  As a result, the desirability to
concentrate litigation in this forum is significantly present.  Plaintiff knows of no difficulty to be
encountered in the management of this action that would preclude its maintenance of a class
action.  Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the
Class would be proper.

# VI.

# CAUSES OF ACTION

**COUNT 1 – VIOLATION OF TENN. CODE ANN.§ 63-6-225(a) & § 63-6-226(a) [AGAINST DEFENDANTS LVI SUPER, LVI, VISION HOLDINGS, RYNERSON AND RYNERSON PSC]**

152.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

153.    TENN. CODE ANN. § 63-6-225 – Unlawful Division of Fees by Physicians, in pertinent part, states:

> (a)   It is an offense for any licensed physician or surgeon to divide or to agree to divide any fee or compensation of any sort received or charged in the practice of medicine or surgery with any person without the knowledge and consent of the person paying the fee or compensation or against whom the fee may be charged

154.    Any person who violates TENN. CODE ANN. § 63-6-226(a) may be sued by the payor of the medical fee for recovery of trebled the amount of the medical fee paid.  TENN. CODE ANN. § 63-6-226(a), Additional Penalty — Suit for recovery states:

> (a)   Any person[4] who violates §63-6-225 shall also forfeit and pay treble the value of the fee or compensation to the person applying the same or against whom the fee may be charged, or from whom it may have been demanded, and if the party entitled to sue does not sue within two (2) years after the fee or compensation has been paid or demanded, then the state shall have the right to sue for and recover such treble amount, which shall, upon recovery, be paid one-half (½) into the state treasury and one-half (½) to the officer prosecuting the suit.

---

[4] The term "person" includes a corporation, firm, company or association. *See*, Tenn. Code Ann.§ 1-3-105(19)("As used in this code, unless the context otherwise requires … 'Person' includes a corporation, firm, company or association"); *see also*, *Cookeville Reg'l Med. Ctr. Auth. v. Cardiac Anesthesia Servs., PLLC,* No. M2007-02561-COA-R3-CV, 2009 Tenn. App. LEXIS 786 at *17-18 (Tenn. Ct. App. Nov. 24, 2009)(applying TENN. CODE ANN. § 63-6-225(a) to limited liability company)

155.    LVI Super, Vision Holdings and LVI were clearly dividing medical fees with Rynerson and/or Rynerson PSC. LVI and/or Vision Holdings paid the operating physicians (or their PSCs) a per eye procedure payment out of the full procedure paid by the patient (or a third party), with LVI and/or Vision Holdings keeping the remainder of the medical payment as its own.

156.    Further, in LVI's corporate deposition, given by Erika Jackson (the Director of Legal for Vision Holdings), LVI admitted that the division of medical payments to ophthalmologists, optometrists and LVI were not disclosed to patients. (Erika Jackson - LVI Rule 30.02(6) Corporate Depo. at 44:21 – 46:1).

157.    As a direct and proximate result their acts and omissions, Defendants LVI Super, LVI, Vision Holdings,[5] Rynerson and Rynerson PSC have violated of TENN. CODE ANN. § 63-6-225(a) and TENN. CODE ANN. § 63-6-226(a). Plaintiff and the Class Members are entitled to recover from these Defendants treble the amount of all payments made to Defendants for the last two (2) years preceding the filing of this Class Complaint.

**COUNT 2 – AIDING AND ABETTING VIOLATION OF TENN. CODE ANN.§ 63-6-225 (a) & § 63-6-226(a) [AGAINST DEFENDANTS LVI SUPER; AUDAX LVI; AUDAX MANAGEMENT; FONDO; CANADA, INC.; THE CANADA, INC. CONTROL PERSON DEFENDANTS, INC. AND THE VISION GROUP OFFICER DEFENDANTS]**

158.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

159.    Pursuant to Tennessee common law, for harm resulting to a third person from the tortious conduct of another, a person is liable if he:

---

[5] Although an automatic stay is in place as to Vision Holdings and LVI is in place, neither of these Defendants are "necessary parties" let alone "indispensable parties" under Fed. R. Civ. Pro. 19 because they are, at most, joint tortfeasors. *See Howard and all similarly situated persons v. Wilkes & McHugh, P.A., et al*, Case No. 06-2833-JMP (W.D. Tenn. Sept, 27, 2009, at p. 7)(denying motion to dismiss class action under Rule 19 where non-joined party was merely a joint tortfeasor; *see also, Wright v. Linebarger Googan Sampson & Blair, LLP*, 782 F. Supp 2d 593, 607 (W.D. Tenn. 2011)(denying motion to dismiss class action for same legal rationale).

(a) orders or induces such conduct, knowing of the conditions under which the act is done
or intending the consequences which ensue, <u>or</u>

(b) knows that the other's conduct constitutes a breach of duty and gives substantial
assistance or encouragement to the other so to conduct himself, <u>or</u>

(c) gives substantial assistance to the other in accomplishing a tortious result and his own
conduct, separately considered, constitutes a breach of duty to the third person.

160.    Defendants LVI Super, Audax LVI, Audax Management, Fondo, Canada, Inc.,
the Canada, Inc. Control Person Defendants, the Vision Group Officer Defendants and Vision
Group have each aided and abetted Defendants LVI, Rynerson and Rynerson PSC's violations of
TENN. CODE ANN.§ 63-6-225 (a) & § 63-6-226(a).

161.    As alleged above in detail, these Defendants learned that the profitability of LVI's
eye clinics, as owned and managed by Vision Holdings, solely depended upon the number of
paid-for eye surgeries that would be performed by licensed Tennessee physicians in any given
period of time.

162.    These Defendants knew that the faster LVI could run the patients through its eye
surgical clinic, faster and higher profits could be achieved by LVI and Vision Holdings. As a
result, Audax knew that LVI and Vision Holdings needed to operate as a conveyor belt provider
of medical surgeries in order to meet the investment goals established by Audax as a private
hedge fund. Further, Audax reviewed the MSAs utilized by LVI and drafted by Vision Holdings
and became aware that LVI and Vision Holdings were dividing medical fees with physicians
without the knowledge or consent of Tennessee patients.

163.    These Defendants also became aware that the MSAs were shams designed to
disguise the division of medical fees by, among other things, the establishment of fictitious

41

Overhead Fees, Facility Fees and Equipment Fees. Audax also knew that, in order to ramp up

revenue, the MSAs required operating physicians to treat at least four (4) patients per hour,

regardless of the needs of these patients and the medical fees were being shared by Tennessee

doctors with LVI and Vision Holdings.

164.    As a direct and proximate result of their acts and omissions, LVI Super, Audax

LVI, Audax Management, Fondo, Canada, Inc., the Canada, Inc. Control Person Defendants, the

Vision Group Officer Defendants and Vision Group are liable for violations of TENN. CODE

ANN. § 63-6-225(a) and TENN. CODE ANN. § 63-6-226(a).

165.    Plaintiff and the Class Members are entitled to recover from these Defendants

treble the amount of all payments made to LVI and/or Vision Holdings for the last two (2) years

preceding the filing of this Class Complaint

**COUNT 3 – CIVIL CONSPIRACY TO VIOLATE TENN. CODE ANN.§ 63-6-225(a) or (b)
AND TO ENGAGE IN THE UNLAWFUL CORPORATE PRACTICE OF MEDICINE
[AGAINST DEFENDANTS LVI SUPER, AUDAX MANAGEMENT, AUDAX LVI,
CANADA, INC., THE CANADA, INC. CONTROL PERSON DEFENDANTS AND THE
VISION GROUP OFFICER DEFENDANTS, RYERSON AND RYNERSON PSC]**

166.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if set

forth fully herein.

167.    Under Tennessee law, a civil conspiracy is a combination between two or more

persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself

unlawful by unlawful means.

168.    Each of the Defendants named in this Count entered into an understanding and

scheme that, with respect to Vision Holdings and LVI's Tennessee eye clinics, LVI would

engage in the corporate practice of medicine in contravention of Tennessee public policy (and

yet to attempt to disguise same with the MSA) and to unlawfully divide physicians fees and/or

obtain unreasonable and unlawful percentages of those medical fees in contravention of TENN.

42

Case 2:20-cv-02402-JPM-tmp    Document 36    Filed 07/15/20    Page 43 of 52
PageID 416

CODE ANN.§ 63-6-225(a) or (b).

169.    Upon its acquisition of a controlling interest of Vision Holdings in 2014, LVI

Super – along with Audax LVI, and Audax Management –  became parties to this tacit

combination and, as alleged above, took overt steps to carry out these unlawful goals.

170.    Upon its acquisition of a controlling interest of Vision Holdings in March 2019,

Canada, Inc. became parties to this tacit combination with LVI Super and, as alleged above, took

overt steps to carry out these unlawful goals.

171.    As a direct and proximate result of their overt acts, Defendants LVI Super, Audax

LVI, Audax Management, Fondo, Canada, Inc., the Canada, Inc. Control Person Defendants, the

Vision Group Officer Defendants, Rynerson and Rynerson PSC have conspired to cause

violations of TENN. CODE ANN. § 63-6-225(a) and TENN. CODE ANN. § 63-6-226(a) and

Tennessee's prohibition barring the corporate practice of medicine.

## COUNT 4 – UNJUST ENRICHMENT [AGAINST LVI SUPER, CANADA, INC., VISION HOLDING, LVI, RYNERSON AND RYNERSON PSC]

172.    Plaintiff incorporates all allegations of fact in all preceding paragraphs as if set

forth fully herein.

173.    Under Tennessee law, Defendant LVI Super, LVI and Vision Holdings are

prohibited from engaging in the corporate practice of medicine, which is against Tennessee

public policy. *See*, *State ex rel. Loser v. National Optical Stores Co*., 225 S.W.2d 263 (Tenn.

1949).

174.    In an endeavor to grossly enrich themselves from the assets of Plaintiff and the

Class Members, the Defendants named in this Count engaged in the corporate practice of

medicine as alleged in detail above, recovering millions of dollars in unlawful amounts from

Tennessee patients.

43

175.    By paying these unlawful medical charges, Plaintiff and the Class Members have conferred a significant monetary benefit upon Defendants Super LVI, LVI,Vision Holdings, Rynerson and Rynerson PSC.  Defendants received these funds and thus appreciated this significant benefit.

176.    In light of the fact that these billings were clearly an unlawful practice, Defendants' acceptance of this significant benefit, under such circumstances, renders it inequitable for Defendants to retain the benefit without payment of the value thereof.

### COUNT 5 – CONSTRUCTIVE FRAUD [AGAINST DEFENDANTS LVI SUPER, CANADA, INC., VISION HOLDINGS, LVI, RYNERSON AND RYNERSON PSC]

177.    Plaintiff incorporates all allegations in all preceding paragraphs as if set forth fully herein.

178.    As alleged above, the Defendants named in this Count owed the legal obligation to Plaintiff and the Class Members to not engage in the prohibited corporate practice of medicine. These Defendants, however, did not intend to honor this legal obligation.

179.     Thus, Defendants billed and collected medical services while engaging in the corporate practice of medicine in order to obtain substantially more money than they could have otherwise lawfully received from providing services to Rynerson and/or Rynerson PSC for a reasonable sum in the absence of practicing medicine.

180.    Defendants' acts and/or omissions in this regard operated as virtual fraud on Plaintiff and the Class Members which, if generally permitted, would be prejudicial to the public welfare and were not clearly resolvable into mere accident or mistake.

181.    Under constructive fraud, it is irrelevant whether, in the opinion of Defendants, their actions were justifiable, allowable or allegedly unconnected with any selfish, evil design or intent to defraud.  Therefore, by engaging in the above described misconduct, and by

committing the actions and omissions alleged in this Complaint, Defendants have committed

constructive fraud despite any claim by them that their omissions and actions were made

without any intent to defraud and/or that they believed their actions were justifiable or

allowable.

182.    As a direct and proximate cause of Defendants' constructive fraud, Plaintiff and

the Class Members are entitled to receive restitution and or compensatory damages in the

amount representing all those amounts received by Defendants in their unlawful scheme.

**COUNT 6 – CONSTRUCTIVE TRUST AS A REMEDY [AGAINST ANY DEFENDANTS RECEIVING A MONETARY BENEFIT FROM THE WRONGFUL ACTS ALLEGED HEREIN]**

183.    Plaintiff incorporates all allegations in all preceding paragraphs as if fully set

forth in this Class Complaint.

184.    A constructive trust arises contrary to intention and *in invitum* [against an

unwilling party], against one who, by commission of a wrong, or by any form of unconscionable

conduct, artifice, concealment, or questionable means, or who in any way against equity and

good conscience, either has obtained or holds the legal right to property which he ought not, in

equity and good conscience, hold and enjoy.  As a result of the above described wrongful

conduct, Defendants have obtained millions of dollars of medical payments from Tennessee

patients, *viz.* the Plaintiff and the Class Members, which, in equity and good conscience, they

should not hold and enjoy and therefore, this Court should establish a constructive trust from

which the Plaintiff and the Class Members may recover.

**COUNT 7 – CORPORATE OFFICER LIABILITY [DEFENDANT FONDO, THE VISION GROUP OFFICER DEFENDANTS, AND THE CANADA, INC. CONTROL PERSON DEFENDANTS]**

185.    Plaintiff incorporates all allegations in all preceding paragraphs as if fully set

forth in this Class Complaint.

186.     The Vision Group Officer Defendants, the Canada, Inc. Control Person Defendants and Defendant Fondo were charged in law with the affirmative official responsibility in the management and control of the corporate businesses they each served. They cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval.

187.     As alleged in detail above, each of the Defendants named in this Count directed, ordered, ratified, approved, or consented to the wrongful acts of LVI Super, Audax LVI, Vision Holdings, LVI and/or Canada, Inc.

188.     As a direct and proximate cause of the actions, the Vision Group Officer Defendants, the Canada, Inc. Control Person Defendants and Defendant Fond are personally liable in monetary damages to Plaintiff and the Class Members.

## COUNT 8 - PUNITIVE DAMAGES AS A REMEDY [AGAINST ALL DEFENDANTS]

189.     Plaintiff incorporates all allegations in all preceding paragraphs as if fully set forth in this Class Complaint.

190.     Each Defendant alleged herein acted intentionally and/or recklessly with respect to their wrongful conduct because they were aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiff and the Class Members by virtue of their unlawful conduct.  As a result, Defendants' actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

46

191.    Because of Defendants' wrongful conduct, punitive damages are warranted in

order to punish Defendants and to deter them from future misconduct.

192.    With respect to the applicable factors that may be addressed by the fact finder

when determining punitive damages, Plaintiff would allege as follows:

(i)    Defendants' financial affairs, financial condition and net worth
range in the multimillions of dollars;

(ii)    The nature and reprehensibility of Defendants' wrongdoing is
substantial because Defendant have intentionally or recklessly
abused and taken advantage of a class of persons who are in need
of proper medical care;

(iii)   Defendants were aware of the harm that could and would be
caused to Plaintiff and the Class Members with respect to their
wrongful conduct;

(iv)    Defendants' misconduct has spanned several years;

(v)    In order to recover their losses, Plaintiff and the Class Members
will incur substantial costs;

(vi)    Defendants profited significantly from the unlawful collection of
their medical services directly from the assets of Plaintiff and the
Class, and, as a result, a significant punitive award is the only
method to deter future similar misconduct.

193.    Based upon the above allegations and factors, Plaintiff and the Class Members

would respectfully request entry of a punitive award in an amount to be determined by the trier

of fact.

**COUNT 9– VIOLATIONS OF TCPA, TENN. CODE ANN § 47-18-104(a) &(b)**

**(INDIVIDUAL CLAIM ONLY AGAINST RYNERSON, VISION HOLDINGS AND LVI)**

194.    Plaintiff incorporates all allegations in all preceding paragraphs as if fully set

forth in this Count.

195.    The TCPA, TENN. CODE ANN. § 47-18-109(a)(1), provides that "[a]ny person who

suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article,

commodity, or thing of value wherever situated, as a result of the use or employment by another

person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an

action individually to recover actual damages."

196.    Plaintiff is a natural person and, as such, constitutes "person" as that term is

defined by the TCPA, TENN. CODE ANN. § 47-18-103(13) and, thus, falls within the meaning of

the term "any person" as contained in the TCPA, § 47-18-109(a)(1).  Although TCPA, § 47-18-

109(a)(1) does not require any person asserting a claim thereunder to also constitute a consumer,

Plaintiff does, in fact, constitute a "consumer" as that term is defined by TCPA, TENN. CODE

ANN. § 47-18-103(2) because, *inter alia*, Plaintiff acquired medical services from Defendants.

197.    Defendants constitute a "person" as defined by the TCPA, TENN. CODE ANN. §

47-18-103(13) and fall within the meaning of the term "another person" as contained in the

TCPA, § 47-18-109(a)(1). The provision of medical services to Plaintiff and the Class by

Defendants constitutes "services" as that term is defined by TCPA, TENN. CODE ANN. § 47-18-

103(18).

198.    Pursuant to the TCPA, TENN. CODE ANN. § 47-18-109(a)(1), Plaintiff is entitled to

bring a private action for Defendant's violations of the TCPA because, among other things, she

has suffered an ascertainable loss of money.

199.    Defendants' wrongful conduct violates TENN. CODE ANN. § 47-18-104(5) because

Defendants represented that their services carried with it characteristics which were not true.

Specifically, in LVI's consent form it claimed that LVI was not practicing medicine when in fact

it was and that this practice was against Tennessee public policy. Further, Defendants failed to

disclose to Plaintiff that it was dividing medical fees with licensed physicians.

200.    Had Defendants make these disclosures, Plaintiff would have not used LVI and

would have paid no sums to Defendants.

201.    Pursuant to the TCPA, TENN. CODE ANN. § 47-18-109(3), Defendants' unfair or

deceptive conduct was willful and/or knowing and, thus, Plaintiff is entitled to an award of three

(3) times her compensatory damages. Plaintiff further alleges that she is entitled to an award of

her reasonable attorney's fees and costs, as provided for under TENN. CODE ANN. § 47-18-

109(e)(1).

202.    Lastly, pursuant to TENN. CODE ANN. § 47-18-109(b), Plaintiff seeks a judgment

declaring that the above described conduct constitutes an unfair act or practice in violation of the

TCPA and enjoining Defendants from further engaging in such unfair acts and/or practices.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, the named Plaintiff and the Class Members demand judgment against

Defendants The LASIK Vision Institute, LLC, James M. Rynerson, James M. Rynerson, PSC,

LVI Intermediate Holdings, Inc. d/b/a Vision Group Holdings, LLC, LVI Super Intermediate

Holdings, Inc., LVI HoldCo, LLC, AG LVI Holdings, LLC, Audax Management Company,

LLC, 9597930 Canada, Inc., Mark Jamie Cohen, Avi Wallerstein, Michael C. Fondo, Lisa Ann

Melamed, Raymond R. Monteleone, Ben L. Cook, Mark A. Hockenson, William Wolz, Chris

Folsom, and Erika Jackson as designated in the Counts of this Class Action Complaint and the

following relief:

1.    Issue service of process and serve each Defendant;

2.    Issue an Order certifying that this action may be maintained as a Class Action,

appointing Plaintiff and her counsel to represent the Class, and directing that

reasonable notice of this action be given by Defendants to the Class Members;

3.      Grant any reasonable request to Amend Plaintiff's Class Action Complaint to
conform to the discovery and evidence obtained in this class action;

4.      Empanel a jury to try this matter;

5.      Award Plaintiff and the Class Members compensatory and trebled damages in an
amount not less than $9,840,000.00;

6.      Award pre-judgment interest in the amount of 10% per annum pursuant to TENN.
CODE ANN.§ 47-14-123 and post-judgment interest in an amount according to the
proof at trial with respect to Plaintiff and the Class Members' liquidated damages
awarded;

7.      Grant declaratory relief to Plaintiff and the Class Members as requested herein;

8.      Award punitive damages against each Defendant in an amount not less than
$19,680,000.00;

9.      Award costs and expenses incurred in this action pursuant to Rule 54 of the
Federal Rules of Civil Procedure;

10.     Award Plaintiff her reasonable attorney's fees and cost with respect to her
individual claim arising under the TCPA, pursuant TENN. CODE ANN. § 47-18-
109(e)(1).

11.     Grant the Plaintiff Class Members such further relief as the Court may deem just
and proper.

Respectfully submitted,

/s Frank L. Watson, III
Frank L. Watson, III (Tenn. Bar No. 15073)
William F. Burns (Tenn. Bar No. 17908)
William E. Routt (Tenn. Bar No. 28577)
WATSON BURNS, PLLC
253 Adams Avenue
Memphis, Tennessee 38103
Phone: (901) 529-7996
Fax: (901) 529-7998


s/ Tim Edwards
John Timothy Edwards (Tenn. Bar No.5353)
BALLIN BALLIN & FISHMAN, P.C.
Suite 1250
200 Jefferson Ave.
Memphis, TN  38103
Phone: (901) 525-6278
Fax: (901) 525-6294
Email: tedwards@bbfpc.com

*Counsel for Plaintiff Tamara Williams and the
absent Class Members*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 15, 2020, the foregoing was electronically filed with the United States District Court for the Western District of Tennessee and was served on counsel for all parties who have appeared in this action through the Court's CM/ECF system.

s/ Frank L. Watson, III